Gerrit M. Pronske
State Bar No. 16351640
Vickie L. Driver
State Bar No. 24026886
Melanie P. Goolsby
State Bar No. 24059841
PRONSKE & PATEL, P.C.
2200 Ross Avenue, Suite 5350
Dallas, Texas 75201
(214) 658-6500 - Telephone
(214) 658-6509 – Telecopier
Email: gpronske@pronskepatel.com
Email: vdriver@pronskepatel.com
Email: mgoolsby@pronskepatel.com

**COUNSEL FOR SCHOOL FOR ALLIED**
**HEALTH PROFESSIONALS, LTD.**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **SCHOOL FOR ALLIED HEALTH** | § | |
| **PROFESSIONALS, LTD.** | § | **CASE NO. 09-40950-RFN-11** |
| | § | **Chapter 11** |
| **Debtor.** | § | |

**PLAN PROPONENTS' FIRST AMENDED DISCLOSURE STATEMENT**
**DATED APRIL 20, 2010**

I.   **INTRODUCTION**

This is the disclosure statement (the "Disclosure Statement") in the small business chapter 11 case of School for Allied Health Professionals, Ltd. (the "Debtor"). This Disclosure Statement contains information about the Debtor and describes the Debtor's First Amended Plan of Reorganization, Dated April 20, 2010 (the "Plan"). The Plan is jointly proposed by the Debtor and SFAHP Management, LLC (the "General Partner" and, together with the Debtor, the Plan Proponents"), general partner of the Debtor. A full copy of the Plan is attached to this Disclosure Statement as **Exhibit "A."** *Your rights may be affected. You should read the Plan and this Disclosure Statement carefully and discuss them with your attorney. If you do not have an attorney, you may wish to consult one.*

The proposed distributions under the Plan are discussed at pages 5-9 of this Disclosure Statement. General unsecured creditors are classified in Class 2, and will receive a distribution of 50% of their allowed claims from excess cash flow.

### A. Purpose of This Document

This Disclosure Statement describes:

- The Debtor and significant events during the bankruptcy case,
- How the Plan proposes to treat claims or equity interests of the type you hold (*i.e.*, what you will receive on your claim or equity interest if the plan is confirmed),
- Who can vote on or object to the Plan,
- What factors the Bankruptcy Court (the "Court") will consider when deciding whether to confirm the Plan,
- Why the Debtor believes the Plan is feasible, and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation, and
- The effect of confirmation of the Plan.

Be sure to read the Plan as well as the Disclosure Statement. This Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights.

### B. Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing

The Court has not yet confirmed the Plan described in this Disclosure Statement. This section describes the procedures pursuant to which the Plan will or will not be confirmed.

1. *Time and Place of the Hearing to Finally Approve This Disclosure Statement and Confirm the Plan*

The hearing at which the Court will determine whether to finally approve this Disclosure Statement and confirm the Plan will take place on _____, at _____, before the Honorable Russell F. Nelms, United States Bankruptcy Judge, Room 204, U.S. Courthouse 501 W. Tenth Street, Fort Worth, Texas

2. *Deadline For Voting to Accept or Reject the Plan*

If you are entitled to vote to accept or reject the plan, vote on the enclosed ballot and return the ballot to Louis Whatley, Pronske & Patel, P.C., 2200 Ross Ave., Ste. 5350, Dallas, TX 75201. See **Section IV. A.** below for a discussion of voting eligibility requirements.

Your ballot must be received by _____, 2010 at ____ __.m. or it will not be counted.

3. *Deadline for Objecting to the Adequacy of Disclosure and Confirmation of the Plan*

Objections to this Disclosure Statement or to the confirmation of the Plan must be filed with the Court and served upon counsel for the Debtor by _____, 2010 at ____ __.m.

    4. *Identity of Person to Contact for More Information*

If you want additional information about the Plan, you should contact Debtor's Counsel, Vickie L. Driver, Pronske & Patel, P.C., 2200 Ross Avenue, Suite 5350, Dallas, Texas 75201.

  C. **Disclaimer**

*The Court has conditionally approved this Disclosure Statement as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms. The Court has not yet determined whether the Plan meets the legal requirements for confirmation, and the fact that the Court has approved this Disclosure Statement does not constitute an endorsement of the Plan by the Court, or a recommendation that it be accepted. The Court's approval of this Disclosure Statement is subject to final approval at the hearing on confirmation of the Plan. Objections to the adequacy of this Disclosure Statement may be filed until _____, 2010 at \_\_\_\_ \_\_.m.*

II. **BACKGROUND**

  A. **Description and History of the Debtor's Business**

The Debtor is a state of the art teaching facility located in Arlington, Texas. The Debtor offers students five different programs of study, including Advanced Surgical Assistant, Medical Insurance and Coding Specialist, Pharmacy Technician, Medical Assistant, and Dental Assistant. The Debtor's staff consists of degreed directors, instructors, and physicians who have experience in the designated programs. In addition to the Debtor's teaching services, the Debtor holds instructive teaching labs using up to date equipment and techniques.

  B. **Insiders and Equity Security Holders**

Attached hereto as **Exhibit "B"** is a list of the Debtor's insiders and equity security holders as of the Petition Date.

  C. **Management of the Debtor Before and During the Bankruptcy**

During the two years prior to the date on which the bankruptcy petition was filed, the Debtor's general partner and .01% owner, SFAHP Management, LLC (the "General Partner") managed the Debtor. Dr. Manuel Pecana is the President of the General Partner and Nora Flores and Robert Fischer are Vice Presidents of the General Partner (collectively the "Managers").

The Managers of the Debtor have been the same throughout the Debtor's chapter 11 case and will continue to serve in the same capacity after the effective date of the order confirming the Plan.

**DEBTOR'S DISCLOSURE STATEMENT, DATED APRIL 20, 2010 – Page 3 of 16**

### D. Events Leading to Chapter 11 Filing

The General Partner has been working tirelessly to obtain Title IV funding, which will enable the Debtor's students to obtain federal, and most state, student aid to fund the tuition and fees charged by the Debtor. While enrollment is strong, the Debtor experienced problems in reduced revenue due to students' inability to pay normal tuition costs and increased operating costs due, almost exclusively, to increasing lease obligations. Such rising expenses and declining revenue, coupled with wait times to obtain Title IV certification, caused the Debtor to seek bankruptcy protection.

### E. Significant Events During the Bankruptcy Case

<u>Petition Date</u>. On or about February 18, 2009, the Debtor filed its voluntary petition for chapter 11 bankruptcy.

<u>Employment of Legal Counsel</u>. On March 25, 2009, the Debtor sought to employ the law firm of Pronske & Patel, P.C. as counsel for Debtor. On April 29, 2009, the Bankruptcy Court entered an order approving the employment of Pronske & Patel, P.C. as counsel for the Debtor.

<u>Employment of Special Counsel</u>. On May 19, 2009, the Debtor sought to employ the law firm of Fischer & Sanger as special counsel for Debtor. On July 13, 2009, the Bankruptcy Court entered an order approving the employment of Fischer & Sanger as counsel for the Debtor.

<u>Employment of Accountant</u>. On May 19, 2009, the Debtor sought to employ the accounting firm of K.P. Monaco & Associates, P.C. as accountant for Debtor. On July 13, 2009, the Bankruptcy Court entered an order approving the employment of K.P. Monaco & Associates, P.C. as accountant for the Debtor.

<u>Rejection of Wakefield Lease</u>. On December 16, 2009, the Debtor rejected the Wakefield Lease[1] by operation of law. By agreement with WC-Arlington, the Court entered an order on February 25, 2010 under which Debtor is to turnover the property subject to the Wakefield Lease to WC-Arlington on or before May 30, 2010.

<u>Post-Petition Operations of Debtor</u>. Debtor's Monthly Operating Reports reflecting post-petition operations through February 28, 2010 are attached hereto as **Exhibit "C"** and incorporated by reference herein.

### F. Projected Recovery of Avoidable Transfers

The Debtor has not yet completed its investigation with regard to prepetition transactions. If you received a payment or other transfer within 90 days of the bankruptcy, or other transfer avoidable under the Code, the Debtor may seek to avoid such transfer.

---

[1] Capitalized terms not defined herein shall have the same meaning ascribed to them in the Plan.

### G. Claims Objections

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtor reserves the right to object to claims. Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld. The procedures for resolving disputed claims are set forth in **Article V** of the Plan. The deadline to file an objection to a claim is sixty (60) days after the effective date of the Plan.

### H. Current and Historical Financial Conditions

The identity and fair market value of the estate's assets are listed in the Debtor's Schedules, attached hereto as **Exhibit "D."** Valuations of assets therein were provided by the Debtor.

## III. SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

### A. What is the Purpose of the Plan of Reorganization?

As required by the Code, the Plan places claims and equity interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of claims or equity interests is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

### B. Unclassified Claims

Certain types of claims are automatically entitled to specific treatment under the Code. They are not considered impaired, and holders of such claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code. As such, the Debtor has *not* placed the following claims in any class:

1. *Administrative Expenses*

Administrative expenses are costs or expenses of administering the Debtor's chapter 11 case that are allowed under § 507(a)(2) of the Code. Administrative expenses also include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the date of the bankruptcy petition. The Code requires that all administrative expenses be paid on the effective date of the Plan, unless a particular claimant agrees to a different treatment.

The following chart lists the Debtor's estimated administrative expenses, and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Professional Fees, as estimated:<br>Pronske & Patel, P.C.<br>Fischer & Sanger<br>K.P. Monaco & Associates, P.C. | $45,000.00<br>$30,000.00<br>$7,000.00 | Paid in full on the effective date of the Plan, according to separate written agreement, or according to court order if such fees have not been approved by the Court on the effective date of the Plan. |
| WC-Arlington, LLC Administrative Expense Claim | $320,000 | Paid pursuant to the terms of a cash-flow promissory note (the "Cash Flow Note") from the excess proceeds of Debtor's post-Effective Date revenue less operating expenses and an allowance for a $50,000 cash reserve (the "Excess Cash Flow"). The Cash Flow Note is subject to such terms and forms as approved by WC-Arlington and the Debtor. Payments to commence on the Cash Flow Note on the first business day following ten (10) days from the General Partner's receipt of Title IV Funding. |
| Expenses Arising in the Ordinary Course of Business After the Petition Date | $100,000 | Paid in full on the effective date of the Plan, as compromised, or according to terms of obligation, if later. |
| TOTAL | $502,000 | |

2.  *Priority Tax Claims*

Priority tax claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Code. Unless the holder of such a § 507(a)(8) priority tax claim agrees otherwise, it must receive the present value of such claim, in regular installments paid over a period not exceeding 5 years from the order of relief.

The following chart lists the Debtor's estimated § 507(a)(8) priority tax claims and their proposed treatment under the Plan:

| Description (name and type of tax) | Estimated Amount Owed | Date of Assessment | Treatment |
|---|---|---|---|
| Internal Revenue Service, WT-FICA taxes | $12,713.82 | 3/2/2009, 5/25/2009 | Pmt interval         = Quarterly<br><br>Begin date           = 9/1/2010<br>End date             = 9/31/2015<br>Interest Rate        = 4.5% |

### C. Classes of Claims and Equity Interests

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

#### 1. *Classes of Secured Claims*

The Debtor has no secured creditors.

#### 2. *Classes of Priority Unsecured Claims*

Certain priority claims that are referred to in §§ 507(a)(1), (4), (5), (6), and (7) of the Code are required to be placed in classes. The Code requires that each holder of such a claim receive cash on the effective date of the Plan equal to the allowed amount of such claim. However, a class of holders of such claims may vote to accept different treatment.

The following chart lists all classes containing claims under §§ 507(a)(1), (4), (5), (6), and (a)(7) of the Code and their proposed treatment under the Plan:

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| 1 | Priority unsecured claim pursuant to Section 507(a)(4)<br><br>Total amt of claims = $ 10,950.00 | impaired | Each holder of a Class 1 Priority Claim will be paid monthly, over a 12 month period, starting September 1, 2010. |

#### 3. *Class of General Unsecured Claims*

General unsecured claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code.

The following chart identifies the Plan's proposed treatment of Class 2, which contains general unsecured claims against the Debtor:

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| 2 | General Unsecured Class<br><br>Total amt of estimated claims = $321,258.87 | impaired | Each holder of a Class 2 Unsecured Claim shall receive quarterly payments in a total amount equal to 50% of their Allowed Claim from the Excess Cash Flow to begin after payment in full of the WC-Arlington Administrative Claim. |

<u>Credit against WC-Arlington Unsecured Claim</u>. Debtor shall receive a $50,000 credit against the WC-Arlington Unsecured Claim if: (i) Debtor proposes a candidate to WC-Arlington to lease the Premises on or before December 31, 2010, and (ii) the candidate is acceptable to WC-Arlington and takes possession of the Premises on or before December 31, 2010.

4. *Class of Equity Interest Holders*

Equity interest holders are parties who hold an ownership interest (i.e., equity interest) in the Debtor. In a partnership, equity interest holders include both general and limited partners. The Debtor has both a general partner and a limited partner. In addition to the General Partner described in Section II, C., the Debtor's limited partners (the "Limited Partners") as of the Petition Date are reflected, along with their respective percentage ownership, in the chart attached hereto as **Exhibit "B**."

The percentage ownership of each Equity Interest Holder will be diluted to allow a 9.9% equity interest in the Debtor in favor of WC-Arlington (the "WC-Arlington Equity Interest") and additional limited partnership interest to Nora Flores in exchange for her waiving her right to payment of $124,000.00 for post-petition salary. After this dilution, each Equity Interest Holder, with the exception of the WC-Arlington Equity Interest, will retain their interest. Such diluted ownership percentages are reflected in **Exhibit "B**."

All parties agree to execute all documents necessary to effectuate the above-described equity interests and transfers, including without limitation, mutually acceptable confidentiality and nondisclosure agreements.

The following chart sets forth the Plan's proposed treatment of the class of equity interest holders:

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| 3 | Equity interest holders | impaired | The percentage ownership of each Equity Interest Holder will be diluted to allow a 9.9% equity interest in the Debtor to be granted to WC-Arlington (the "WC-Arlington Equity Interest") and an interest equal to $124,000 transferred to Nora Flores. |

The required post-Confirmation capital contributions and equity holders in the Debtor total $350,000.00 and are detailed in **Exhibit "B"** hereto.

After eighteen (18) months following the Debtor's first payment under the Cash Flow Note, the Equity Interest Holders may offer to buyout the WC-Arlington Equity Interest for an amount equal to five times the Debtor's Earnings Before Interest, Taxes, Depreciation, and Amortization (EBITDA), based on a twelve (12) month trailing average (the "Buyout Offer"). The Buyout Offer shall expire after a period of thirty (30) days (the "Buyout Offer Option Period"). During the Buyout Offer Option Period, WC-Arlington may publicly market its WC-Arlington Equity Interest, subject to a confidentiality and non-disclosure agreement, the form of which is subject to Debtor's prior approval. The Equity Interest Holders shall have a right of first refusal regarding any offers that WC-Arlington obtains during the Buyout Offer Option Period.

### D. Means of Implementing the Plan

#### 1. *Source of Payments*

Payments and distributions under the Plan will be funded by either an infusion of capital, from new equity, and/or cash flow from Debtor's operations.

The Debtor shall continue operating its business following the effective date of this Plan and shall dedicate sufficient revenues to fund all obligations contained herein. The General Partner shall continue to apply for and hold any and all licenses and/or regulatory permits in connection with the operation of the Debtor's business, including any right to receipt of Title IV funding (the "Licenses") for the benefit of the Debtor and shall not sell, assign, or encumber the Licenses without to the prior written consent of the Debtor and WC-Arlington. The General Partner shall remain the Debtor's general partner and shall assign all rights to payment under the Licenses, including the right to receipt of Title IV funding, to Debtor during the life of the Plan and/or as long as WC-Arlington retains the WC-Arlington Equity Interest, whichever period is longer. ***The Plan also provides that the General Partner is enjoined and restrained pursuant to Section 105 of the Bankruptcy Code from resigning as the General Partner of the Debtor, taking any action that will modify the partnership relationship between the General Partner and the Debtor, assigning, encumbering, or alienating its interest in the Licenses or its rights to receipt of the proceeds from the Licenses, and/or taking any other action that is in any manner inconsistent with the terms contained in the Plan during the life of the Plan and/or as long as WC-Arlington retains the WC-Arlington Equity Interest, whichever period is longer.*** Alternatively, subject to final approval and documentation between counsel for the Debtor and counsel for WC-Arlington and confirmation by Debtor's counsel that such a grant will not impermissibly violate or encumber the Licenses, the General Partner may grant to WC-Arlington a first-priority security interest in the Licenses and any proceeds from the Licenses to secure WC-Arlington's right to payment under the Cash Flow Note.

#### 2. *Location of Operations*

The Debtor has entered into a new, 10-year lease with Rupert Murdog, LLC for the premises located at 4100 Embarcadero, Arlington, Texas where the school will operate (the "Embarcadero Lease"). A true and correct copy of the Embarcadero Lease is attached to the Plan as **Exhibit "1**." Only Dr. Pecana, a 13.68% Limited Partner in the Debtor and 100% owner

in the General Partner, owns less than 5% of Rupert Murdog, LLC. Otherwise, no insider of the Debtor is an equity owner of Rupert Murdog, LLC. The terms of the Embarcadero Lease are substantially better than the Wakefield Lease, which has been rejected by the Debtor, and the Debtor's entry into the Embarcadero Lease is in the ordinary course and in Debtors' best business judgment. Terms of the Embarcadero Lease include, but are not limited to, monthly rent in the amount of $11,000.00 covering all utility expenses, common area management expenses, taxes, and insurance, and also $105,000.00 in tenant improvement funds, so that the Debtor will have a custom build-out in the new space. The Plan is also a motion for approval of Debtor's entry into the Embarcadero Lease.

3. *Post-confirmation Management*

The Post-Confirmation Managers of the Debtor, and their compensation, shall be as follows:

| Name | Affiliations | Insider (yes or no)? | Position | Compensation |
|---|---|---|---|---|
| Dr. Manuel Pecana | Equity holder | yes | President of General Partner and Limited Partner | None |
| Nora Flores | Employee and Equity holder | yes | Vice President of General Partner | $100,000.00 per year |
| Robert Fischer | Special Counsel for the Debtor and Equity Holder | yes | Vice President of General Partner | Paid hourly as professional |

E. **Risk Factors**

The proposed Plan has the following risks:

The Debtor's general partner is currently awaiting Title IV certification that would allow the Debtor's students to pay tuition and other expenses with federal student loans. The Debtor anticipates that its general partner will receive such certification on or about August 2010. This additional source of funding for the Debtor's students will allow more students to access to the Debtor as an educational institution.

The Debtor's future income from operations will be impacted by the federal certification. As this issue has not yet been finally resolved, it is a risk factor associated with the Plan.

F. **Executory Contracts and Unexpired Leases**

**DEBTOR'S DISCLOSURE STATEMENT, DATED APRIL 20, 2010 – Page 10 of 16**

The Plan lists all executory contracts and unexpired leases that the Debtor will assume under the Plan. Assumption means that the Debtor has elected to continue to perform the obligations under such contracts and unexpired leases and to cure defaults of the type that must be cured under the Code, if any.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of performance, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time.

All executory contracts and unexpired leases that are not listed in Section 6.01 of the Plan will be rejected under the Plan. Consult your adviser or attorney for more specific information about particular contracts or leases.

If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.

***The Deadline for Filing a Proof of Claim Based on a Claim Arising from the Rejection of a Lease or Contract Is 30 days from the date of the order confirming the Plan.*** Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court orders otherwise.

### G. Tax Consequences of Plan

***Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, And/Or Advisors.***

## IV. CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmable, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Code. These include the requirements that: the Plan must be proposed in good faith; at least one impaired class of claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and the Plan must be feasible. These requirements are <u>not</u> the only requirements listed in § 1129, and they are not the only requirements for confirmation.

### A. Who May Vote or Object

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan. A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

In this case, the Debtor believes that classes 1-3 are impaired and that holders of claims in each of these classes are therefore entitled to vote to accept or reject the Plan.

1. *What Is an Allowed Claim or an Allowed Equity Interest?*

Only a creditor or equity interest holder with an allowed claim or an allowed equity interest has the right to vote on the Plan. Generally, a claim or equity interest is allowed if either (1) the Debtor has scheduled the claim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest. When a claim or equity interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

***The deadline for filing a proof of claim in this case was June 23, 2009.***

2. *What Is an Impaired Claim or Impaired Equity Interest?*

As noted above, the holder of an allowed claim or equity interest has the right to vote only if it is in a class that is *impaired* under the Plan. As provided in § 1124 of the Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

3. *Who is **Not** Entitled to Vote*

The holders of the following six types of claims and equity interests are *not* entitled to vote:

- holders of claims and equity interests that have been disallowed by an order of the Court;

- holders of other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes.

- holders of claims or equity interests in unimpaired classes;

- holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code;

**DEBTOR'S DISCLOSURE STATEMENT, DATED APRIL 20, 2010 – Page 12 of 16**

- holders of claims or equity interests in classes that do not receive or retain any value under the Plan; and

- administrative expenses.

***Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan and to the Adequacy of the Disclosure Statement.***

### 4. *Who Can Vote in More Than One Class*

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim.

### B. Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes, as discussed later in Section B.2.

### 1. *Votes Necessary for a Class to Accept the Plan*

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class who vote cast their votes to accept the Plan.

### 2. *Treatment of Non-accepting Classes*

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the non-accepting classes are treated in the manner prescribed by § 1129(b) of the Code. A plan that binds non-accepting classes is commonly referred to as a "cram down" plan. The Code allows the Plan to bind non-accepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of § 1129(a)(8) of the Code, does not "discriminate unfairly," and is "fair and equitable" toward each impaired class that has not voted to accept the Plan.

***You should consult your own attorney if a "cramdown" confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.***

### C. Liquidation Analysis

The Debtor could convert the case to Chapter 7 and allow a bankruptcy trustee to be appointed to liquidate and distribute assets. In the event that the Court does not confirm a plan of reorganization in this case, conversion to Chapter 7 will ultimately result. The Debtor believes this alternative to be unsatisfactory for the reasons stated below. In addition, Unsecured Creditors would receive no funds in the event that the Debtor's assets are liquidated under Chapter 7 of the Bankruptcy Code.

The result of a conversion of this case to Chapter 7 liquidation would be the appointment of a Chapter 7 Trustee, who would liquidate the Debtor's assets and pay the Debtor's prepetition and postpetition creditors in the order of priority, beginning with nonclassified administrative expense claims and ending with Class 2 General Unsecured Claims and Class 3 Equity Interests, on a pro rata basis within each class until Debtor's liquidated estate was exhausted. The Chapter 7 Trustee will also likely incur expenses and fees while liquidating the Debtor's estate, which expenses and fees would be entitled to payment from the Debtor's estate before the payment of any of Debtor's pre-conversion claims. The Debtor will be stripped of its assets and thus the ability to generate operating revenue. Distribution to any claim class lower in priority than unclassified administrative expense claims would likely be zero, whereas under Debtor's Plan, the Debtor will be able to generate positive cash flow and pay a greater percentage of claims.

### D.      Feasibility

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

1. *Ability to Initially Fund Plan*

The Debtor believes it will have enough cash on hand on the effective date of the Plan to pay all the claims and expenses that are entitled to be paid on that date. A chart showing the amount of cash on hand on the effective date of the Plan and the sources of that cash shall be filed as **Exhibit "E"** to this disclosure statement within ten (10) business days of the hearing to confirm the plan.

2. *Ability to Make Future Plan Payments and Operate Without Further Reorganization*

The Debtor must also show that it will have enough cash over the life of the Plan to make the required Plan payments.

The Debtor has provided projected financial information attached hereto as **Exhibit "F."**

The Debtor's financial projections show that the Debtor will have an aggregate annual average cash flow, after paying operating expenses and post-confirmation taxes, sufficient to pay all claims as described in the Plan. The final Plan payment is expected to be paid on September 31, 2015.

**DEBTOR'S DISCLOSURE STATEMENT, DATED APRIL 20, 2010 – Page 14 of 16**

*You Should Consult with Your Accountant or other Financial Advisor If You Have Any Questions Pertaining to These Projections.*

V.　　**EFFECT OF CONFIRMATION OF PLAN**

　　A.　　**Discharge**

Discharge of Claims.  Except as otherwise provided in the Plan or in the Confirmation Order, the rights afforded in the Plan and the payments and distributions to be made thereunder shall discharge all existing debts and Claims of any kind, nature, or description whatsoever against the Debtor or any of its assets or properties to the extent permitted by section 1141 of the Bankruptcy Code.  Upon the Effective Date, all existing Claims against the Debtor shall be deemed to be discharged, and all holders of Claims shall be precluded from asserting against Debtor's assets or properties any other or further Claim based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder filed a proof of claim.

Discharge of Debtor.  Any consideration distributed under the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Claims of any nature whatsoever against the Debtor or any of its assets or properties.  Upon the Effective Date, the Debtor shall be deemed discharged and released to the extent permitted by section 1141 of the Bankruptcy Code from any and all Claims, including but not limited to demands and liabilities that arose before the Effective Date, whether or not (a) a proof of claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code; (b) a claim based upon such debt is allowed under section 502 of the Bankruptcy Code; or (c) the holder of the claim based upon such debt has accepted the Plan.  The Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtor.  Pursuant to section 524 of the Bankruptcy Code, such discharge shall void any judgment against the Debtor at any time obtained to the extent it relates to a claim discharged and operates as an injunction against the prosecution of any action against the Debtor or the property of the Debtor, to the extent it relates to a claim discharged.

　　B.　　**Modification of Plan**

The Debtor may modify the Plan at any time before confirmation of the Plan.  However, the Court may require a new disclosure statement and/or re-voting on the Plan. The Debtor may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated *and* (2) the Court authorizes the proposed modifications after notice and a hearing.

　　C.　　**Final Decree**

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Debtor shall file a motion with the Court to obtain a final decree to close the case.  Alternatively, the Court may enter such a final decree on its own motion.

Dated: April 20, 2010.

        Respectfully submitted,

By: */s/ Robert Fisher*
Robert Fischer, Vice President of General Partner of Debtor

By: */s/ Vickie L. Driver*
Gerrit M. Pronske
State Bar No. 16351640
Vickie L. Driver
State Bar No. 24026886
Melanie P. Goolsby
State Bar No. 24059841
Pronske & Patel, P.C.
2200 Ross Avenue, Suite 5350
Dallas, Texas 75201
(214) 658-6500- Telephone
(214) 658-6509 - Facsimile
gpronske@pronskepatel.com - Email
vdriver@pronskepatel.com - Email
mgoolsby@gmail.com – Email

**COUNSEL FOR DEBTOR**